Ross C. Anderson (#0109)
**LEWIS HANSEN**
The Judge Building
Eight East Broadway, Suite 410
Salt Lake City, Utah 84111
Telephone: (801) 746-6300
Fax: (801) 746-6301
randerson@lewishansen.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TERRY MITCHELL,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>RICHARD WARREN ROBERTS,<br><br>　　　　　Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Case No.: _____<br><br>Judge: _____ |

Plaintiff Terry Mitchell ("Mitchell") hereby complains against Defendant Richard Warren Roberts ("Roberts") and, demanding trial by jury, alleges as follows:

## JURISDICTION AND VENUE

1.　　　This Court has federal diversity jurisdiction over Mitchell's claims, pursuant to 28 U.S.C. § 1332, as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

2.　　　Venue in this Court is proper under 28 U.S.C. § 1391, as a substantial part of the events complained of occurred in this judicial district.

1

## PARTIES

3.     Mitchell is and was at all material times a resident and citizen of the State of Utah.

4.     Defendant Roberts is a resident and citizen of a state other than the State of Utah.

## INTRODUCTION

5.     This is an action for damages arising from a former twenty-seven-year-old federal prosecutor's coercion of, and outrageous maintenance of a predatory sexual relationship with, a sixteen-year-old witness in a major lawsuit being prosecuted by the perpetrator.

## FACTUAL BACKGROUND AND ALLEGATIONS RELATED TO THE REVIVAL OF MITCHELL'S CLAIMS AGAINST ROBERTS

6.     On August 20, 1980, Joseph Paul Franklin ("Franklin"), who murdered more than twenty people in several states with the purpose of starting a race war, hunted and murdered Ted Fields ("Ted") and David Martin ("David"). Franklin killed Ted and David, who were African Americans, because they were jogging and walking with Mitchell, who is half Latina and half Caucasian, and Karma Ingersoll ("Ingersoll"), who is Caucasian. Franklin murdered Ted and David as they walked together with Mitchell and Ingersoll at the crosswalk of 900 South and 500 East in Salt Lake City, Utah. Mitchell, then fifteen years old, was injured by shrapnel from bullets that killed David and went through his body.

7.     Mitchell was emotionally and physically isolated after the murders, leaving her extremely vulnerable to a predator such as Defendant Roberts, who pretended to be on her side. She was the target of cruel and devastating attacks and accusations by the media, fellow students, and others in the community. For instance:

        a.     The news media reported misinformation and communicated false implications about Mitchell and her father. The news media implied that Mitchell set up Ted and David to be murdered and falsely characterized the relationship between Ingersoll and Mitchell

with Ted and David as "boyfriends" and "girlfriends" (in at least one instance referring to Ted and David as the girls' "black boyfriends"). The news media made irrelevant references to her father, who was president of the Barons Motorcycle Club, which was a few blocks away from the crosswalk where the attack occurred, implying that he was involved in the murders. The *Salt Lake Tribune*, outrageously, published the address of Mitchell at least five times. Mitchell's father left to live in Montana to escape the public pressure caused by the implications of the news media that he was involved in the murders.  Following numerous verbal and physical threats against Mitchell, she feared that she and her family would be attacked by people seeking vengeance for the deaths of Ted and David.

b.      Family members of Ted and David, as well as many others, initially suspected Mitchell, and she learned she was not welcome at the funerals held for Ted and David.

c.      Mitchell was ostracized by all of her friends, except her sister and mother, despite previously being a popular and well-liked person who was an honor-roll student during elementary, junior high school, and high school, "Miss Dream Girl" at Jordan Junior High, a volunteer reading tutor for approximately five years, head cheerleader in junior high and high school, and a member of tennis teams from elementary school until her sophomore year in high school.

d.      Mitchell was aware that her mother was harassed and bullied every day at work, including being confronted in the restroom and having notes left at her desk blaming Mitchell for the murders (including an article with words and phrases such as "It was the Barons (a Salt Lake motorcycle club)," "hookers," "girls set them up for it," and "white bitches" highlighted). Both Mitchell and her mother avoided eating and drinking so that they would not

have to use public restrooms and expose themselves to attack, which caused them both extreme undesired and unhealthy weight loss.

      e.    Mitchell was harassed and degraded at school, where she found written on her locker death threats and abusive language, including "nigger-loving whore," "spic," "race traitor," "murderer," and "sniper girl." She was frequently followed and threatened with being physically attacked by students, both Black and White, in the restrooms, on the bus, at a party, at a dance, at a shopping mall, and other locations.

      f.    Mitchell's younger sister, in second grade, was brutally attacked to the point that pieces of her scalp lay on the floor. This event debilitated and terrified Mitchell, and she blamed herself for its occurrence.

      g.    Unidentified individuals drove by the homes of Mitchell's parents with guns pointed toward their windows. Mitchell called a police dispatcher who informed her, "Maybe you should have thought about that before you hung out with those niggers. Call us if anything happens. We're busy."

      h.    Mitchell was depicted by some as "white trash" and compared to prostitutes for being accompanied by two Black males.

      i.    Several members of Mitchell's family blamed her and denounced her for befriending African Americans. She was told by some family members, "You should have known better," "They wouldn't be dead if they weren't with you," "You got what you deserved," and, "Maybe now you'll listen."

      j.    Approximately two months prior to the murders, Mitchell was violently raped by Phillip George Moore ("Moore") at a location west of the Salt Lake City International Airport during a terrifying episode that lasted nearly four hours. She was able to provide the vehicle

registration of the rapist to the police the night of the crime, and Moore was soon identified and arrested. After the murders, the news media published details of the rape and suggested the killer may have been the rapist who attempted to silence Mitchell but, as a result of bad aim, accidentally shot and killed Ted and David.

8.     Approximately one week after the murders, Mitchell, wearing bandages from the shrapnel injuries, attended a hearing against Moore. Moore pled guilty to raping Mitchell and to raping another young girl while on bail after being charged of raping Mitchell.

9.     In October of 1980, Mitchell turned sixteen and fled to Arizona to live with her paternal grandparents and avoid the domestic terror threats and lack of police protection she experienced in Salt Lake City. Later that month, police captured Franklin. At some point in the winter of 1980, Mitchell returned to Salt Lake City, where she met Defendant Roberts, who was then twenty-seven years old, and the other prosecuting attorneys for the federal civil rights case against Franklin.

10.     Through January or February of 1981, Mitchell had many meetings with Defendant Roberts, either over the phone or with one or both of her parents present, to prepare for trial. Defendant Roberts had access to Mitchell's records with her counselor, who was appointed by the court as a result of her rape case. He also knew from disclosures to him by Mitchell of the extreme isolation of, and threats against, Mitchell, as described in paragraph 7 above. At this point, Mitchell had been raped or otherwise sexually abused and groomed for sexual abuse by several men, including her mother's stepfather, from the time she was a toddler.

11.     Defendant Roberts had knowledge of and assessed Mitchell's vulnerabilities and exploited them in interacting with her and gaining her trust. Defendant Roberts made it appear he was understanding and sympathetic. Defendant Roberts used his authority, his education, his

sophistication, and his affluence to make it appear to Mitchell, Mitchell's mother, personnel in the U.S. Attorney's office, and others that he was safe and to be trusted with Mitchell.

12.     Mitchell perceived Defendant Roberts as different than anyone she had previously known: he was well-spoken, well-dressed, well-educated, and seemingly very kind and compassionate. Defendant Roberts manipulated Mitchell into trusting him.

13.     Around the end of January or the beginning of February of 1981, Defendant Roberts directed Mitchell's mother to drive her to the federal courthouse for an in-person meeting to prepare Mitchell as a witness for the upcoming trial. Her mother drove Mitchell to the courthouse and instructed Mitchell to hurry home to feed and take care of her younger sisters while their mother was working. The security guard notified Defendant Roberts of Mitchell's arrival and permitted her to enter the building. When Mitchell arrived at Defendant Roberts's office, photos of Ted Martin and David Fields, bullet-ridden, bloody, and dead, were scattered over his desk. Mitchell was stunned, further traumatized, and rendered extremely vulnerable while Defendant Roberts cleared away the photos. At the behest of Defendant Roberts, the two of them discussed details of the case already covered in previous meetings. Mitchell noted they had already discussed the same matters before and asked why he had wanted her to come to his office. Defendant Roberts conceded she was right and said he would take her out to dinner. He asked her where they should go, but Mitchell was unable to adequately answer because, due to her experience of poverty, she had not eaten at restaurants unless she and her family worked there. She was concerned and confused about why he was taking her to dinner, especially after she protested that she needed to go home to fix dinner for her sisters.

14.     Mitchell complied because Defendant Roberts was an authority figure and she had learned and been manipulated to comply with those in positions of authority.

6

15.     Defendant Roberts chose a restaurant and sat next to Mitchell in a small booth meant for two people to sit across from each other. After a while, Defendant Roberts placed his hand on Mitchell's thigh toward the end of dinner, confusing, upsetting, and alarming Mitchell. She tried to remain calm by telling herself that she was "making a big deal out of nothing" because she still trusted and looked up to Defendant Roberts and she could not conceive at that point that Defendant Roberts could be another predator in her life.

16.     Mitchell assumed Defendant Roberts was going to take her home after the meal. However, Defendant Roberts said he needed to stop by his hotel to pick up something first and that it would only take "a minute."  Mitchell responded that she did not live far from the hotel and asked that he take her home first.  Defendant Roberts insisted he stop by his hotel first.

17.     After arriving at the hotel, Mitchell pleaded to wait in the car. Defendant Roberts refused, saying it was too cold and that he was not going to leave her alone.

18.     Mitchell then asked if she could just go to the bus stop and take the bus home. At that point, she was afraid, confused, and intimidated, frantic about avoiding going to the hotel with Defendant Roberts. Defendant Roberts opened her door and with a stern, frightening, and authoritative voice said, "Terry get out of the car. Now!" Frightened, intimidated, sensing that something very bad was happening yet wanting to believe that Defendant Roberts was not like the other predators in her life, and not feeling she had a choice, Mitchell complied and got out of the car and walked to the hotel lobby with Defendant Roberts.

19.     Mitchell then requested to wait in the lobby. Defendant Roberts adamantly refused, saying that it would seem strange to people if they saw her waiting in the hotel lobby. Mitchell's suspicions, panic, fear, intimidation, and sense of alarm increased even further at that point.

20.     When Mitchell and Defendant Roberts reached his hotel room door, Mitchell, extremely fearful and panicking, requested to wait outside his room in the hallway. Defendant Roberts refused and sternly insisted she enter his room, making it seem he thought she was being ridiculous in wanting to wait in the hall. He said it would look bad to others if Mitchell were waiting in the hallway outside his door. Mitchell believed she had no choice and that her refusal would make a very frightening and confusing situation worse.

21.     When, through deceit and coercion, Defendant Roberts finally had Mitchell in his hotel room, against her will, he locked the door, took off her jacket, began kissing her neck, and said, "You aren't going anywhere until I get a taste of you." Mitchell was terrified and shocked. She replied that she was "not ready for this." Mitchell made it clear she did not consent to any sexual contact with Defendant Roberts. Intimidated, confused, dissociated, and clearly never consenting, Mitchell realized—like she had many times since being a toddler—that sex was going to happen whether she liked it or not and that fighting back would only prolong the agony of sex abuse and the accompanying shame, humiliation, and terror.  Every time Mitchell said anything to protest, Defendant kissed her as if his sexual abuse were a romantic seduction.

22.     Defendant Roberts then took off Mitchell's clothing, against her will. He carried her to the bed. He then performed oral sex on her and demanded that she perform oral sex on him, all against her will. He then raped her twice. Mitchell was not given a choice and was ignored when she communicated, verbally and physically, that she did not consent. Defendant Roberts took Mitchell home at approximately 10:00 or 11:00 pm.

23.     Defendant Roberts did not use a deadly weapon and, unlike some of Mitchell's previous experiences of rape and other sexual abuse, she was not beaten, smothered, choked, bitten, spit on, bloodied, or bruised. Instead, Defendant Roberts groomed and intimidated Mitchell,

made her feel she had no choice but to do what he told her to do, and exploited the psychological and emotional vulnerabilities of sixteen-year-old Mitchell who, as Defendant Roberts well knew, had experienced a lifetime of sexual abuse, grooming, violence, and rape, including a violent, four-hour-long rape just six months earlier, the murder of her two friends as they walked beside her just five months earlier, and tremendous trauma and physical and emotional isolation.

24.     Defendant Roberts maintained the secrecy of his abuse by using intimidation, deception, artifice, and the coercive, victim-blaming threat to Mitchell that if anyone discovered Defendant Roberts was engaging in sex acts with Mitchell, then a mistrial would occur.  That threat continued for months after the trial, communicated repeatedly by Defendant Roberts in telephone conversations initiated by Defendant Roberts with Mitchell. Based on Defendant Roberts's assertions that people would see it as Mitchell's fault, and because of her prior horrendous experiences with the news media and with members of the community, Mitchell believed that she would be blamed if there were a mistrial. Mitchell feared that if there were a mistrial, Franklin would be allowed to go free, enabling him to continue his murderous, racist campaign. Mitchell felt immense guilt for surviving the attack that killed her friends. She blamed herself for the attack and everything that followed. Mitchell was terrified by Franklin and did not want anyone else to die or suffer.

25.     When presenting the testimony of a witness, a prosecutor has the duty to avoid any actual, or even the appearance of, personal bias. Perhaps the most outrageous violation of that duty would be to have sex with a major eyewitness of the case, particularly a young girl who was as vulnerable as Mitchell. Defendant Roberts used his own astoundingly inappropriate conduct as a threat against Mitchell to ensure her submission and silence.

26.     Defendant Roberts continued to manipulate and control Mitchell for his own sexual, emotional, and ego gratification throughout the rest of his stay in Salt Lake City before, during, and shortly after the trial. Defendant Roberts convinced Mitchell that his continued child sexual abuse of her was somehow her fault. He said at times, after placing Mitchell naked in front of a mirror, that he could not stop himself because of how attractive Mitchell was.

27.     Defendant Roberts sought to characterize his continued child sexual abuse of Mitchell as an "affair," even to the point of representing to Mitchell that he might end his then-pending engagement to be married so that he could be with Mitchell.

28.     Defendant Roberts intimidated, coerced, and manipulated Mitchell to have sexual intercourse, and Defendant Roberts otherwise sexually abused Mitchell, nearly every day for several weeks—from before the Franklin trial began until after it was concluded, including on Roberts's way to the airport to leave Salt Lake City. Defendant Roberts's routine, generally, was to pick Mitchell up from home or the courthouse, then take her to dinner, then to his hotel room. At the hotel room, among other things, he would strip Mitchell and often angle the television toward the mirror so he could watch himself having sex and watch himself on television being interviewed about the trial at the same time. It was all very creepy and disturbing to Mitchell.

29.     The last day Defendant Roberts was in Utah, he met with Mitchell at her home and took photos of her, clothed and naked, with a Polaroid camera and demanded sexual compliance from her one last time. He gave her the photos of herself with her clothes on and kept nude photos of her for himself.

30.     Franklin was convicted and Roberts left Utah in March of 1981. Defendant Roberts has never returned to Utah since that time.

31.     On November 20, 2013, hours after the execution of Franklin, Defendant Roberts sent two emails to Mitchell from his judicial chambers and from his United States District Court email address after many years of no communications between them. This event was extremely troubling and traumatizing to Mitchell, causing her to focus on memories she had tried to keep out of her mind because they caused so much pain, feelings of self-blame, shame, humiliation, anger, confusion, and anguish, triggering migraine headaches (some lasting for a few weeks), night terrors, relationship problems, and cognitive difficulties.

32.     Mitchell suffered, and continues to suffer, physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short, periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings and earning capacity, as a result of the outrageous abuses of power and influence Defendant Roberts exercised over her, his multiple rapes, and his sexual and emotional exploitation of Mitchell.

33.     Defendant Roberts was 27 years old at all times during which Defendant Roberts committed the child sexual abuse—within the meaning of Utah Code Ann. § 78B-2-308, as amended by H.B. 279 (General Session 2016)—against Mitchell, who was 16 years of age at the time. Mitchell is, as of the date of this Complaint, 51 years of age.

34.     Defendant Roberts's acts of child sexual abuse were committed with the intent to arouse and gratify the sexual desires of Defendant Roberts.

35.     Defendant Roberts's acts of sexual intercourse, sodomy, and molestation constitute sexual abuse of a child as defined by Utah Code § 78B-2-308.

36.     Mitchell's civil action described herein was time-barred as of July 1, 2016, and is now revived and can now be brought against Roberts within three years of May 10, 2016, the effective date of Utah Code § 78B-2-308, as amended by H.B. 279 (General Session 2016), or within 35 years of Mitchell's eighteenth birthday, as provided in the current version of Utah Code Ann. § 78B-2-308.

## FIRST CLAIM FOR RELIEF

### *ASSAULT*

37.     Mitchell re-alleges and incorporates by reference the allegations above as if set forth fully herein.

38.     Defendant Roberts repeatedly, over a several week period during and before the trial of Franklin, indicated by his words and actions that he was going to cause harmful and offensive contact with Mitchell and did in fact cause such harmful and offensive contact and child sexual abuse, within the meaning of the term in Utah Code Ann. § 78B-2-308, including but not limited to kissing her, stripping her, performing oral sex on her, demanding she perform oral sex on him, fondling her, and having sexual intercourse with her, all without her consent and to her severe detriment.

39.     Defendant Roberts, by the acts set forth above, intended to cause harmful and offensive contact with Mitchell and intended to put Mitchell in imminent apprehension of harmful or offensive contact, including child sexual abuse.

40.     Defendant Roberts, by the acts set forth above, put Mitchell in imminent apprehension of harmful or offensive contact, including child sexual abuse, by Defendant Roberts.

41.     As a proximate and direct result of Defendant Roberts's actions, Mitchell suffered and continues to suffer damages including physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short, periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings and earning capacity.

42.     Mitchell is entitled to recover from Defendant Roberts all damages sustained by her as a proximate and direct result of Defendant Roberts's conduct, including, but not limited to, the damages described above, in a total amount to be shown at trial of at least fifteen million dollars.

43.     Defendant Roberts's conduct was willful and malicious, and manifested a knowing and reckless indifference toward, and disregard of, the rights of Mitchell. Therefore, Mitchell is entitled to an award of punitive damages from and against Defendant Roberts of no less than ten million dollars.

**SECOND CLAIM FOR RELIEF**

*BATTERY*

44.     Mitchell re-alleges and incorporates by reference the allegations above as if set forth fully herein.

45.     Defendant Roberts repeatedly, over a several week period during and before the trial of Franklin, intended to cause harmful and offensive contact with Mitchell and did in fact cause such harmful and offensive contact and child sexual abuse, including but not limited to

kissing her, stripping her, performing oral sex on her, demanding she perform oral sex on him, fondling her, and having sexual intercourse with her.

46.     As a proximate and direct result of Defendant Roberts's actions, Mitchell suffered and continues to suffer damages including physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short, periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings and earning capacity.

47.     Mitchell is entitled to recover from Defendant Roberts all damages sustained by her as a proximate and direct result of Defendant Roberts's conduct, including, but not limited to, the damages described above, in a total amount to be shown at trial of at least fifteen million dollars.

48.     Defendant Roberts's conduct was willful and malicious, or manifested a knowing and reckless indifference toward, and disregard of, the rights of Mitchell, and therefore she is entitled to an award of punitive damages from and against Defendant Roberts of no less than ten million dollars.

## THIRD CLAIM FOR RELIEF

### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

49.     Mitchell re-alleges and incorporates by reference the allegations above as if set forth fully herein.

50.     Defendant Roberts, through his position as an attorney for the Department of Justice and through his words and behavior, represented to Mitchell, to her mother, and to the public that he would fulfill his duty to uphold justice and posed no threat to Mitchell.

51.     Defendant Roberts knew that, as a result of Franklin's horrifying attack and her history of abuse, Mitchell suffered extreme guilt, shame, isolation, distress, fear, and a sense of powerlessness.

52.     Defendant Roberts, while prosecuting a major lawsuit against Franklin, preyed on Mitchell—one of Franklin's victims and a witness at the trial against him—and for several weeks raped and otherwise sexually abused Mitchell. Defendant Roberts used intimidation, deception, coercion, manipulation, artifice, and knowledge of Mitchell's personal history as a vulnerable victim of abuse to gain her trust, isolate her, and sexually abuse her.

53.      Defendant Roberts exploited the vulnerabilities of Mitchell, whom he knew to be a recent victim of Franklin's attack that killed her two friends; a recent victim of a violent rape; a victim of rape, sexual abuse, and incest since she was a toddler; a recent target of the media; ostracized by the community and her friends; impoverished; and only sixteen years old. Defendant Roberts used knowledge of Mitchell's vulnerability and past victimization, not as an inspiration for compassion, sympathy, or pursuit of justice, but as an avenue to gain her trust, and thus access to personally perpetuate her long experience of rape and child sexual abuse simply to satisfy his own selfish and predatory sexual, emotional, and egotistical desires.

54.     Defendant Roberts maintained the secrecy of his predatory behavior by using his education and authority to convince Mitchell that the abuse was her fault and that her submission and silence regarding his predatory behavior was required if the man who murdered her two friends when she was with them was not to walk free and continue his racist murder spree. Defendant

Roberts caused Mitchell to believe that her disclosure of Defendant Roberts's multiple rapes of Mitchell and other predatory behavior, including acts of child sexual abuse, toward her would pose a mortal threat to her and others.

55.     Defendant Roberts knew his intimidation, deception, manipulation, coercion, and control of Mitchell would cause devastating, irreparable emotional harm to Mitchell, who trusted him to be compassionate, humane, and just.

56.     In all of his conduct toward Mitchell, Defendant Roberts exploited Mitchell's psychological and emotional vulnerability, not only as a lifelong victim of atrocious abuse and violence, but even simply as a vulnerable sixteen-year-old child.

57.     Defendant Roberts's conduct toward Mitchell was outrageous, intolerable, and offends against the generally accepted standards of decency and morality.

58.     Defendant Roberts intended to cause, and acted in reckless disregard of the likelihood of causing, emotional distress of Mitchell.

59.     As a proximate and direct result of Defendant Roberts's actions, Mitchell suffered and continues to suffer damages including physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short, periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings.

60.     Mitchell is entitled to recover from Defendant Roberts all damages sustained by her as a proximate and direct result of Defendant Roberts's conduct, including, but not limited to,

the damages described above, in a total amount to be shown at trial of at least fifteen million dollars.

61.     Defendant Roberts's conduct was willful and malicious, or manifested a knowing and reckless indifference toward, and disregard of, the rights of Mitchell. Therefore, Mitchell is entitled to an award of punitive damages from and against Defendant Roberts of no less than ten million dollars.

## FOURTH CLAIM FOR RELIEF

### *NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*

62.     Mitchell re-alleges and incorporates by reference the allegations above as if set forth fully herein.

63.     Defendant Roberts knew and should have known that, as a result of Franklin's horrifying attack and Mitchell's history of abuse, Mitchell suffered extreme guilt, shame, isolation, distress, fear, and powerlessness. Defendant Roberts knew, and should have known, that Mitchell was a recent victim of Franklin's attack that killed her two friends; a recent victim of a violent rape; a victim of rape, sexual abuse, and incest since she was a toddler; a recent target of the media; ostracized by the community and her friends; impoverished; and a sixteen-year-old child.

64.     Defendant Roberts knew and should have known that Mitchell trusted him, especially as an attorney for the Department of Justice, to be compassionate, humane, and just.

65.     Defendant Roberts realized and should have realized that his conduct of deception, manipulation, intimidation, coercion, artifice, rape, and child sexual abuse involved an unreasonable risk of causing extreme emotional distress to Mitchell.

66.     Defendant Roberts should have realized from facts known to him that the distress to Mitchell could result in illness or bodily harm.

67.     As a proximate and direct result of Defendant Roberts's actions, Mitchell suffered and continues to suffer damages including physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short, periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings and earning capacity.

68.     Mitchell is entitled to recover from Defendant Roberts all damages sustained by her as a proximate and direct result of Defendant Roberts's conduct, including, but not limited to, the damages described above, in a total amount to be shown at trial of at least fifteen million dollars.

69.     Defendant Roberts acted with knowing and reckless indifference toward, and disregard of, the rights of Mitchell. Therefore, Mitchell is entitled to an award of punitive damages from and against Defendant Roberts of no less than ten million dollars.

## FIFTH CLAIM FOR RELIEF

### *FALSE IMPRISONMENT*

70.     Mitchell re-alleges and incorporates by reference the allegations above as if set forth fully herein.

71.     In addition to luring Mitchell to his hotel room, the walls of which were boundaries fixed by Defendant Roberts, under false pretenses and against her will, and locking the door, preventing her from escaping, before he first raped and otherwise sexually abused her, as described in paragraphs 13–21 above, Defendant Roberts, during a break in the trial of Franklin, also coerced

Mitchell, against her will, to enter a small room off the courtroom, the walls of which were boundaries fixed by Defendant Roberts, where Franklin was being tried for murdering Mitchell's two friends. When inside that small room, Defendant Roberts, against Mitchell's will, pushed Mitchell against the wall, stuck his tongue into her mouth, and reached his hands inside her blouse, under her bra, and inside her pants and panties, fondling her bare breasts and her vagina, all to the shock and horror of Mitchell.

72.     Mitchell was unable to escape or bring to the attention of anyone her circumstances because of the fear created by Roberts that the circumstances, if brought to the attention of anyone in or near the courtroom, would be extremely humiliating and shaming, and, worst of all, would provide a reason for Franklin to escape justice for the murder of Mitchell's friends because, as she had been warned by Defendant Roberts, Franklin might be set free or, at the very least, be permitted a new trial, if anyone learned of Defendant Roberts's sexual misconduct with Mitchell—a sixteen-year-old witness in the very trial where Roberts was prosecuting Franklin.

73.     By engaging in the above-described misconduct, Defendant Roberts intentionally and unlawfully exercised force or the express or implied threat of force, menace, deceit, and unreasonable duress and coercion, to restrain, detain, and confine Mitchell.

74.     The restraint, detention, and confinement compelled Mitchell to go to the places of her confinement and to be held there during Roberts's sexual abuse of Mitchell.

75.     Mitchell did not consent to the restraints, detentions, or confinements described herein.

76.     As a proximate and direct result of Defendant Roberts's actions, Mitchell suffered and continues to suffer damages including physical pain, muscle spasms, cluster migraines, suicidal ideations, night terrors, sleep walking, difficulties with comprehension (such as short,

periodic difficulties in understanding what people are saying), anorexia, nausea, immense emotional distress, detrimental impacts on relationships, anxiety, depression, trauma, post-traumatic stress disorder, anger, distrust, and counseling and medical expenses, and, in addition, Mitchell dropped out of high school, resulting in a tragic end to her remarkable record as a student and in a significant decrease in her earnings and earning capacity.

77.     Mitchell is entitled to recover from Defendant Roberts all damages sustained by her as a proximate and direct result of Defendant Roberts's conduct, including, but not limited to, the damages described above, in a total amount to be shown at trial of at least fifteen million dollars.

78.     Defendant Roberts acted with knowing and reckless indifference toward, and disregard of, the rights of Mitchell. Therefore, Mitchell is entitled to an award of punitive damages from and against Defendant Roberts of no less than ten million dollars.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to the claims for relief set forth herein above, Mitchell is entitled to: (1) judgement against Defendant Roberts, for all general and special damages in an amount to be determined at trial, but no less than fifteen million dollars, (2) punitive damages against Defendant Roberts in an amount to be determined at trial, (3) an award against Defendant Roberts of all reasonable attorneys' fees and costs incurred by plaintiff in this matter, and (4) all further relief as deemed just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all of her claims.


DATED this 29th day of July, 2016.

<strong>LEWIS HANSEN</strong>


By:     /s/ Ross C. Anderson
        Ross C. Anderson
        Attorneys for Plaintiff