*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2020 UT 34**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

———————

TERRY MITCHELL,
*Plaintiff,*

*v.*

RICHARD WARREN ROBERTS,
*Defendant.*

———————

No. 20170447
Heard May 14, 2018
Supplemental Briefing Submitted September 25, 2019
Filed June 11, 2020

———————

On Certification from the
United States District Court for the District of Utah
The Honorable Evelyn J. Furse
Case No. 2:16-cv-00843-EJF

———————

Attorneys:

Ross C. Anderson, Walter M. Mason, Salt Lake City, for plaintiff

Brian M. Heberlig, Linda C. Bailey, Washington D.C.,
Neil A. Kaplan, Shannon K. Zollinger, Troy L. Booher,
Salt Lake City, for defendant

———————

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and
JUSTICE PETERSEN joined.

———————

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 This case is before us on certification from the United States
District Court for the District of Utah. In the underlying federal case
Terry Mitchell asserts civil claims against Richard Warren Roberts.
The claims arise out of allegations that Roberts sexually abused
Mitchell in 1981 when she was sixteen years old. Mitchell alleges that
the abuse took place in the course of interactions she had with
Roberts related to a pending criminal action in which Roberts was a
prosecuting attorney and Mitchell was a witness.

MITCHELL *v.* ROBERTS

Opinion of the Court

¶2 Mitchell concedes that each of her claims against Roberts had expired under the original statute of limitations. But she contends that her claims were revived when the legislature enacted Utah Code section 78B-2-308(7) in 2016. That statute provides that certain civil claims against perpetrators of sexual abuse may be asserted, even if "time barred as of July 1, 2016," if they are "brought within 35 years of the victim's 18th birthday, or within three years of the effective date of this Subsection (7), whichever is longer." *Id.* And Mitchell asserts that her claims against Mitchell were timely filed under this statute because they were brought within three years of its effective date.

¶3 Roberts has responded by challenging the legislature's authority to enact a statute reviving time-barred claims. And that response raises important questions of Utah law. Our case law has long questioned the authority of the legislature to revive a time-barred cause of action,[1] but the nature and basis of any such limitation has not been clearly delineated. With that in mind, the federal court (Magistrate Judge Furse) certified this case to us, asking us to clarify (1) whether the legislature had the authority to "expressly revive time-barred claims through a statute," and (2) whether "the language of Utah Code section 78B-2-308(7), expressly reviving claims for child sexual abuse that were barred by the previously applicable statute of limitations as of July 1, 2016, make(s) unnecessary the analysis of whether the change enlarges or eliminates vested rights."

¶4 In the initial briefing and at oral argument it appeared to us (and to the parties) that the certified questions went only to the legislature's authority as a matter of statutory interpretation (as informed by our case law). On reflection, however, it became clear that the certified questions could not meaningfully be answered without addressing an embedded constitutional issue—as to the effect of due process limitations on the scope of the legislature's power in this area. Because our role in addressing certified questions is to facilitate the disposition of a specific case by the federal district

---

[1] *See State v. Apotex Corp.*, 2012 UT 36, ¶¶ 63, 67, 282 P.3d 66; *Roark v. Crabtree*, 893 P.2d 1058, 1062–63 (Utah 1995); *Del Monte Corp. v. Moore*, 580 P.2d 224, 225 (Utah 1978); *Greenhalgh v. Payson City*, 530 P.2d 799, 802 n.14 (Utah 1975); *In re Swan's Estate*, 79 P.2d 999, 1002 (Utah 1938); *Ireland v. Mackintosh*, 61 P. 901, 902–03 (Utah 1900).

Opinion of the Court

court,[2] we requested supplemental briefing on the constitutional dimension of the questions certified for our decision.[3] The parties submitted careful, extensive briefs on the constitutional question. And we now clarify our law in light of this briefing.

¶5 We hold that the Utah Legislature is constitutionally prohibited from retroactively reviving a time-barred claim in a manner depriving a defendant of a vested statute of limitations defense. This principle is well-rooted in our precedent, a point meriting respect as a matter of *stare decisis*.[4] It is also confirmed by the extensive historical material presented to us by the parties in their supplemental briefs, which shows that the founding-era understanding of "due process" and "legislative power" forecloses legislative enactments that vitiate a "vested right" in a statute of limitations defense.

¶6 We resolve the questions certified to us on this basis. We do not do so lightly. We respect and consistently defer to the legislature's judgment on the broad range of policy matters committed to its discretion. And we acknowledge the reasonable policy basis for the judgment the legislature made in seeking to revive previously time-barred claims asserted by victims of child-sex

---

[2] *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 8, 289 P.3d 502 ("Our function in a certified case is not to issue abstract, advisory opinions on general matters of interest to the federal courts. It is to resolve disputed questions of state law in a context and manner useful to the resolution of a pending federal case.").

[3] We acknowledge that supplemental briefing may delay the timely disposition of a case and may increase litigation costs. But our commitment to procedural fairness may outweigh these concerns in cases like this one that implicate important constitutional issues that the parties have not had an opportunity to address in briefing or at oral argument.

[4] *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 21–22, 345 P.3d 553 (explaining that we do not "overrule our precedents 'lightly'" and in considering whether to do so we look at "(1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down" (citation omitted)); *see also supra* ¶ 3 n.1.

MITCHELL *v.* ROBERTS

Opinion of the Court

abuse. The devastating effects of child-sex abuse can span a lifetime. And as the legislature has indicated, it may take "decades for children and adults to pull their lives back together and find the strength to face what happened to them"—particularly where (as is too often the case) "the perpetrator is a member of the victim's family" or a friend or confidant. UTAH CODE § 78B-2-308(1).

¶7 We would thus uphold the legislature's decision if the question went merely to the reasonableness of its policy judgment. But that is not the question presented for our review. We are asked instead to interpret and apply the terms of the Utah Constitution (in particular, the Due Process Clause). We take a solemn oath to uphold that document—as ratified by the people who established it as the charter for our government, and as they understood it at the time of its framing. That understanding is controlling.

¶8 The original meaning of the constitution binds us as a matter of the rule of law. Its restraint on our power cannot depend on whether we agree with its current application on policy grounds. Such a commitment to originalism would be no commitment at all. It would be a smokescreen for the outcomes that we prefer.

¶9 Our laws are written down for a reason. And a key reason is to establish clear, fixed limits that the public may rely on—unless and until the law is repealed or amended by established procedures for doing so. The people of Utah retain the power to amend the Utah Constitution to alter the legislature's authority in this area if they see fit. But the document as it stands (and as originally understood) forecloses the legislature's power to enact legislation that retroactively vitiates a ripened statute of limitations defense.

¶10 We expand on these points below. First we show that the legislature's power to vitiate a vested right in a ripened limitations defense is foreclosed by our precedent. Then we establish that the principles set forth in our precedent are consistent with the original understanding of due process. And we close by reinforcing our conclusion that the limits on the legislature remain despite the reasonable basis for its policy judgments in this field.

## I. UTAH SUPREME COURT PRECEDENT

¶11 Beginning in 1897 and continuing for over a century, this court has repeatedly stated that the legislature lacks the power to revive a plaintiff's claim in a manner that vitiates a "vested" right of a defendant. Our cases have been less than crystal clear in identifying a constitutional basis for this principle. But the "vested rights" limitation on the legislative power is firmly rooted in our case law. This limitation, moreover, has long been extended to the

Cite as: 2020 UT 34

Opinion of the Court

specific vested right asserted by Roberts—the right to retain a statute of limitations defense after a plaintiff's claim has expired under existing law. And we conclude that our precedent merits respect as a matter of *stare decisis*.

A. Our Case Law

¶12 Our first articulation of the "vested rights" limitation on the legislative power came in *In re Handley's Estate*, 49 P. 829, 832 (Utah 1897). That case arose out of a conflict regarding the distribution of a polygamist father's estate among his children through both his legal marriage and his polygamous marriage. *Id.* at 829. Following the father's death, the children through the polygamous marriage did not receive any portion of the father's estate. *Id.* And they unsuccessfully sued to be recognized as heirs. *Id.* In 1896, several years after the final judgment against the children of the polygamous marriage, the Utah Legislature enacted a statute purporting to allow the polygamous children to relitigate the dispute and inherit a portion of the father's estate. *Id.* at 829–30. In relevant part, that statute clarified that "the issue of . . . polygamous marriages" were "entitle[d] . . . to inherit" under the preexisting inheritance statute. *Id.* at 829. And it said "[t]hat in all cases involving the rights of such issue to so inherit, heretofore determined adversely to such issue in any of the courts of the territory of Utah, a motion for a new trial or rehearing shall be entertained . . . and the courts shall thereupon proceed to hear and determine said motion, and if granted to proceed to hear and determine said case or cases without prejudice from the lapse of time since the former hearing or any prior determination of a like motion." *Id.* at 829–30.

¶13 We struck this statute down as an unconstitutional exercise of judicial power by the legislature. *Id.* at 830–31. In so doing, we concluded that the legislature lacked the power to override a judicial interpretation of law reflected in a final judgment. *See id.* at 830 (explaining that the legislature lacks the power to override a judicial judgment "by a declaratory or explanatory law, giving the law under which the decree was rendered a different construction"). We also framed our separation of powers concerns in terms of "vested rights." We held that the legislature lacked the power to "attempt[] by a retrospective act to furnish a method by which vested rights could be divested, and to compel the courts to employ it." *Id.* at 831. Once "[t]he rights of the children of the lawful wife to the estate in question were ascertained and settled by the decree," we held that they were "vested, and beyond the reach of any remedy . . . the legislature could invent." *Id.* Any other result, we explained, "would, in effect, say that the legislature may exercise judicial powers,

5

MITCHELL *v.* ROBERTS

Opinion of the Court

authorize and require the courts to set aside final judgments and decrees, devest titles, and destroy and annihilate vested rights." *Id.* And we emphasized that "[t]he people of the state have not intrusted such powers to the legislature." *Id.*

¶14 We next applied the "vested rights" limitation in *Ireland v. Mackintosh*, 61 P. 901 (Utah 1900). And we extended it to the specific "right" asserted by Roberts here—a right to retain a statute of limitations defense after the limitations period has run. The statute at issue in *Ireland* extended the limitations period for actions on instruments such as notes from four years to six years. *Id.* at 902. By the time the legislature enacted this statute, the *Ireland* claimant's four-year limitations period had lapsed. *Id.* at 901–02. The claimant cited the statute, however, in support of the view that her claim (filed within six years) was revived. *Id.* at 902. We rejected that position. In so doing, we noted that the defendant had acquired a "vested right" once the statute of limitations had run. *See id.* at 904 (noting that "when appellant's right of action on the note in question became barred under the previous statute, the respondent acquired a vested right, in this state, to plead that statute as a defense and bar to the action"). And we held that the legislature lacked the power to vitiate that vested right.[5] Quoting Thomas Cooley's treatise on constitutional limitations, we held that "[i]t is certain that he who has satisfied a demand cannot have it revived against him, and he who has become released from a demand by the operation of the statute of limitations is equally protected." *Id.* at 903 (quoting THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 454 (6th ed. 1890)). "In both cases," we explained,

---

[5] Our *Ireland* decision concededly included an alternative basis for our ruling. Elsewhere in the opinion we concluded that "it was not the intention of the legislature to revive causes of action on claims which had previously become stale, and against which the statute had fully run." *Ireland v. Mackintosh*, 61 P. 901, 904 (Utah 1900). And we rooted that conclusion in principles of statutory interpretation—noting the "rule of construction" presuming that statutes have only "prospective effect," and holding that the legislature had not clearly stated its intent to revive time-barred claims. *Id.* But this alternative basis for the *Ireland* decision does not erase the "vested rights" analysis, which we have repeatedly endorsed in subsequent decisions.

Cite as: 2020 UT 34

Opinion of the Court

"the demand is gone, and to restore it would be to create a new contract for the parties[—]*a thing quite beyond the power of legislation*." *Id.* (emphasis added) (quoting THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 454 (6th ed. 1890)).

¶15 We have repeatedly restated *Ireland*'s constitutional conclusion in subsequent cases. In *In re Swan's Estate*, 79 P.2d 999 (Utah 1938), we confronted a statute of limitations that had been extended from one year to three years. And we cited *Ireland* in support of the view that this change could not "affect our decision" because the change "was after the bar had become effective in th[e] case." *Id.* at 1002. Our analysis in *Greenhalgh v. Payson City*, 530 P.2d 799 (Utah 1975), is similar. There, we again refused to apply a new statute extending a previous limitations period to a claim already barred under the old statute. Quoting *Ireland*, we held that "[t]he subsequent passage of an act by the legislature increasing the period of limitation could not operate to affect or renew a cause of action already barred." *Id.* at 802 n.14 (citation omitted).[6] Three years later we again parroted the *Ireland* principle in *Del Monte Corp. v. Moore*, holding that "if the statute has run on a cause of action, so that it is dead, it cannot be revived by any . . . statutory extension." 580 P.2d 224, 225 (Utah 1978).

¶16 Our more recent cases have reiterated this same principle. In *Roark v. Crabtree*, for example, we noted that "[s]ince 1900, this court has consistently maintained that the defense of an expired statute of limitations is a vested right." 893 P.2d 1058, 1062 (Utah 1995).[7] And we reemphasized, as in *Ireland*, that our state followed the majority approach "[i]n refusing to allow the revival of time-barred claims through retroactive application of extended statutes of limitations." *Id.* at 1063. "Accordingly, after a cause of action has become barred by the statute of limitations the defendant *has a vested right to rely on*

---

   [6] The quoted language was contained in the syllabus of the *Ireland* opinion.

   [7] The *Roark* decision, like *Ireland*, presented two alternative and independent grounds for the result. First, the statute (and its legislative history) did not give any indication that the statute in question was to be applied retroactively. *Roark v. Crabtree*, 893 P.2d 1058, 1061–62 (Utah 1995). Second, the limitations defense had vested and consequently the barred claim could not be revived by statute. *Id.* at 1062–63.

MITCHELL *v.* ROBERTS

Opinion of the Court

*that statute as a defense . . .* which cannot be taken away by legislation . . . or by affirmative act, such as lengthening of the limitation period." *Id.* (alterations in original) (citation and internal quotation marks omitted).

¶17 Our most recent reiteration of this point came in *State v. Apotex Corp.*, 2012 UT 36, 282 P.3d 66. In *Apotex*, the legislature had extended the limitations period under the Utah False Claims Act (UFCA) and expressly indicated that the extension should be applied retroactively. *Id.* ¶ 14. The claim at issue had already become time-barred under the previous limitations statute. *Id.* ¶ 63. And the State argued that the new extended limitations period should nonetheless apply because "the legislature expressly made this provision retroactive." *Id.* We disagreed. We held that "[t]he amended UFCA cannot resurrect claims that have already expired" because "the defense of an expired statute of limitations is a vested right . . . which cannot be taken away by legislation." *Id.* ¶ 67 (citation omitted).

*B. Stare Decisis*

¶18 Mitchell questions the vitality of a "vested rights" limitation on the legislature's power to adopt retroactive legislation. She acknowledges that this court endorsed such a limitation in *State v. Apotex Corp.*, 2012 UT 36, 282 P.3d 66, but insists that *Apotex* contradicts precedent stretching back to the founding era.

¶19 Mitchell reads our older cases as establishing only a substantive canon of construction or "clear statement rule"—not an outright limit on legislative power. In Mitchell's view, this canon asked first whether the retroactive effect of a statute was stated clearly. If so, the case law (as Mitchell reads it) upheld retroactive legislation even if interfered with a vested right. The vested rights principle, in Mitchell's view, came into play only where the retroactive effect of a statute was not stated clearly. In that event, Mitchell claims that our cases upheld the retroactive sweep of a statute only if it was "procedural" and did not divest any vested rights.

¶20 Some of Mitchell's points are well-taken. Starting with *Ireland*, our case law has long rested on two interrelated principles of retroactivity—(a) a substantive canon or clear statement rule, under which a statute is not read to operate retroactively unless the legislature states its intention clearly; and (b) a rule prohibiting the legislature from retroactively divesting a vested limitations defense regardless of express retroactive language. And our cases have sent mixed signals both about the scope of these principles and their relationship to each other. In some cases we have articulated the

Cite as: 2020 UT 34

Opinion of the Court

second principle as an absolute limitation on judicial power. Yet in others, as Mitchell indicates, we have at least implicitly suggested that the legislature may retroactively divest vested rights if it clearly states its intention to do so.

¶21 Further complicating things, our decisions have mostly arisen in circumstances in which there is no clear, express statement of legislative intent, leaving some question as to whether the vested-rights limitation on legislative power is a freestanding constitutional principle or merely a component of this court's retroactivity analysis. *Apotex* is the principal exception. There we were confronted with a challenge to a 2007 amendment to the UFCA that expressly purported to revive some previously time-barred claims under that act.[8] And we held that the legislature lacked the power to "resurrect claims that have already expired" because "the defense of an expired statute of limitations is a vested right . . . which cannot be taken away by legislation . . . such as lengthening of the limitation period." *Id.* ¶ 67 (citations omitted).

¶22 Mitchell views *Apotex* as an aberration in our case law that departs from over a century of precedent and is inconsistent with the original meaning of the state constitution. She insists that neither our case law prior to *Apotex* nor the original meaning of our constitution supports the vested-rights limitation on the power of the legislature to enact retroactive legislation. And she argues that the *Apotex* decision carries minimal (if any) precedential weight as a matter of *stare decisis* because its reasoning is unpersuasive. Mitchell criticizes the *Apotex* court for its "failure to engage in any constitutional analysis." She also insists that the *Apotex* formulation is not firmly

_____

[8] "Prior to the legislature's amendments to the UFCA in 2007, the Act contained no specific statute of limitations." *State v. Apotex Corp.*, 2012 UT 36, ¶ 65, 282 P.3d 66. But "Utah Code section 78–12–29(3) provided that '[a]n action may be brought within one year . . . upon a statute . . . for a forfeiture or penalty to the state.'" *Id.* (alterations in original). This one-year limitations period had previously applied and already run at the time of the *Apotex* case. The 2007 amendments, however, created a UFCA-specific imitations scheme and expressly purported to revive some previously-barred claims. *See* UTAH CODE § 26-20-15(2) (2007) ("A civil action brought under this chapter may be brought for acts occurring prior to the effective date of this section if the limitations period set forth in Subsection (1) has not lapsed.").

MITCHELL *v*. ROBERTS

Opinion of the Court

entrenched in our law due to its recency and inconsistency with prior case law.[9] And she further claims that *Apotex* is simply wrong as a constitutional matter, as in her view the Utah Constitution contains no outright bar on legislative abrogation of a vested right but only a prohibition on *arbitrary* attempts to do so.

¶23 Mitchell defends the statute at issue here under this standard. She claims that it is not arbitrary, but rooted in the legislature's stated concerns about factors that might prevent the victim of child sexual abuse from coming forward in a timely manner. She notes that the legislature cited "research [showing] that it takes decades for children and adults to pull their lives back together and find the strength to face what happened to them" and that "the perpetrator is [often] a member of the victim's family" or, at the very least, "rarely a stranger." UTAH CODE § 78B-2-308(1). And she insists that the statute withstands scrutiny because these legislative findings show that the legislature was not arbitrarily interfering with a statute of limitations defense.

¶24 We see the matter differently. Our cases admittedly have sent mixed signals. But the constitutional limitation on legislative power articulated most recently in *Apotex* is entitled to respect as a matter of *stare decisis*. And an analysis of that doctrine in the context of this case reveals that the doctrine of *stare decisis* cuts against Mitchell's position rather than in favor of it for several reasons.

¶25 First, the vested rights limitation on legislative power can be traced through our decisions for more than a century. *See supra* ¶¶ 12–17. Our cases may not have identified a clear constitutional basis for the vested rights limitation on the legislative power. But we have long articulated it as a hard limitation on the legislative power—a clear prohibition on legislative attempts to vitiate vested rights. And for well over a century we have specifically held that a defendant acquires a "vested right" in a statute of  limitations defense once the limitations period has run. This limitation was articulated as one of the grounds for our decision in *Ireland*. And it formed the sole basis for our clear holding in *Apotex*.

---

⁹ See *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553 (explaining that "two broad factors that distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down").

Cite as: 2020 UT 34

Opinion of the Court

¶26 Second, we are persuaded that these statements of a hard-and-fast constitutional rule limiting the legislature's power is consistent with the original understanding of our state constitution. *See infra* Part II. Consequently, statements in our case law that suggest otherwise are unpersuasive departures from the original meaning of our state charter. And we do not feel at all tethered to these statements so clearly running contrary to that original meaning here because our case law also amply supports an understanding of legislative power and vested rights that is consistent with the original meaning of the constitution.

¶27 Third, when we were confronted with a case in which the legislature did in fact express its intent to retroactively divest vested rights head on, we held that it lacked the power to do so. *See Apotex*, 2012 UT 36, ¶ 67 (holding the legislature lacked the power to "resurrect claims that have already expired" because "the defense of an expired statute of limitations is a vested right . . . which cannot be taken away by legislation . . . such as lengthening of the limitation period" (citations omitted)). This ruling was consistent both with statements of the vested rights limitation in our prior case law and the original meaning of the constitution.

¶28 Finally, clear statements of constitutional limitation in our historical cases generally and in *Apotex* specifically identify a straightforward, workable rule of law. *See State v. Wilder*, 2018 UT 17, ¶ 26, 420 P.3d 1064 (identifying a decision's "workability, i.e., how well it's 'worked in practice,' and whether it's generated more harm than good" as considerations in whether to overrule precedent (citation omitted)). The rule at stake, moreover, is a principle that may sustain substantial reliance interests. *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553 (explaining that we examine "how well [a precedent] has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on  the precedent would create injustice or hardship if it were overturned" in our *stare decisis* analysis).

¶29 For these and others reasons we could uphold Roberts's position in this case purely on *stare decisis* grounds. We need not do so here, however, because we also conclude that the position set forth in our precedent is also correct as a matter of first principles—under the original understanding of our Utah Constitution.

II. ORIGINAL UNDERSTANDING

¶30 The "vested rights" limitation set forth in our  case  law is also consistent with the original understanding of the Utah Constitution. Our legislature has broad, sweeping power. *See* UTAH

11

MITCHELL *v.* ROBERTS

Opinion of the Court

CONST. art. VI § 1(1) ("The Legislative power of the State shall be vested in . . . the Legislature of the State of Utah . . . ."). But that power is not boundless. It is circumscribed by a range of limitations in the state and federal constitutions. And an original understanding of "legislative power" and the state constitutional right to "due process" confirms the principle set forth in our longstanding case law.

¶31 The Due Process Clause is not "a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis." *In re Steffensen*, 2016 UT 18, ¶ 7, 373 P.3d 186. It is a "constitutional standard . . . measured by reference to 'traditional notions of fair play and substantial justice.'" *Id.* (citation omitted). The historical standard, moreover, encompasses key limitations on the powers of the branches of government. Under our constitution, the executive has the power to enforce law (not to make it), the judiciary has the power to adjudicate cases under existing law in accordance with established procedures, and the legislature has the power to enact general laws to govern behavior going forward.[10] The guarantee of due process, as originally understood, is a principle for enforcement of these limitations. As applied to the question presented here, the due process guarantee has long been understood as a limitation on the legislative power—a prohibition of legislative acts that retrospectively divest a person of vested rights lawfully acquired under pre-existing law.

¶32 In the sections below, we show that this conclusion is confirmed by the general understanding of due process and legislative power in the late nineteenth century. Then we explain that the same understanding prevailed in Utah. And we conclude by establishing that a ripened limitations defense was viewed as a vested right protected from legislative interference.

---

[10] *See Carter v. Lehi City*, 2012 UT 2, ¶¶ 34, 37, 269 P.3d 141 ("Legislative power generally . . . involves the promulgation of laws of general applicability . . . . This power is different from the executive power, which encompasses prosecutorial or administrative acts aimed at applying the law to particular individuals or groups based on individual facts and circumstances. It is also distinguished from the judicial power, which involves the application of the law to particular individuals or groups . . . by resolving specific disputes between parties as to the applicability of the law to their actions.").

Cite as: 2020 UT 34

Opinion of the Court

A. Original Understanding of Due Process and Vested Rights

¶33 In the latter part of the nineteenth century the principle of due process was viewed at least in part through the lens of the separation of powers and the concept of vested rights.[11] Due process thus flavored the original understanding of the "legislative power" throughout the country and specifically in Utah. And the original understanding of the ratifying public dictates our answer to the questions presented in this case.[12]

---

[11] *See* Nathan S. Chapman & Michael W. McConnell, *Due Process As Separation of Powers*, 121 Yale L.J. 1672, 1781–82 (2012) (establishing that "[t]he basic idea of due process . . . at the time of adoption of the Fourteenth Amendment, was that the law of the land required each branch of government to operate in a distinctive manner"; noting that under this framework "the legislature could not retrospectively divest a person of vested rights"); *see also Proceedings and Debates of the Convention Assembled to Adopt a Constitution for the State of Utah*, Day 31 (Apr. 3, 1895), https://le.utah.gov/documents/conconv/utconstconv.htm [hereinafter *Constitutional Convention*] (stating that it is a violation of due process for the legislature "to take what is by existing law the property of one man and without his consent transfer it to another, with or without compensation"); *Ireland v. Mackintosh*, 61 P. 901, 902 (Utah 1900) (framing its analysis of the legislature's power to revive a time-barred limitations defense as a due process issue; holding that the legislature lacked the power to vitiate a vested right in a ripened statute of limitations defense).

In citing this originalist evidence in support of our holding, we are not suggesting that the vested rights concept represents the sum and substance of the original conception of due process. Our case law has long endorsed other elements of the guarantee of due process. And our holding today should not be viewed as rejecting any of our existing precedent. Nor should it be viewed as foreclosing other historical dimensions of the guarantee of due process. *See* Chapman & McConnell, *supra*, at 1676–77 (citing an extensive body of scholarship aimed at uncovering the original understanding of "due process").

[12] *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 67, 416 P.3d 663 ("[T]his court should look to the original meaning of the Utah Constitution when properly confronted with constitutional issues."); *Am. Bush v. City of South Salt Lake*, 2006 UT 40, ¶ 66, 140
(continued . . .)

MITCHELL *v.* ROBERTS

Opinion of the Court

¶34 In the era of the framing of the Utah Constitution, the public understood the principle of "due process," at least in part, as a matter relegating certain functions to the courts and not the legislature. Nathan S. Chapman & Michael W. McConnell, *Due Process As Separation of Powers*, 121 YALE L.J. 1672, 1781–82 (2012). The legislature was viewed as prohibited from exercising judicial functions—in interpreting and applying the law to the disposition of a case in which a party's rights or property were in dispute.[13] "This meant the legislature could not retrospectively divest a person of vested rights that had been lawfully acquired under the rules in place at the time." *Id.* at 1782. The legislature "could enact general laws for the future, including the rules for acquisition and use of property, but [it] could not assume the 'judicial' power of deciding individual cases." *Id.* Retroactive divestment statutes were viewed as judicial in nature (in the nature of "deciding individual cases") because these laws were backward looking and operated to deprive individuals of rights and property "acquired under the rules in place at the time" of acquisition. *Id.* at 1782; *id.* at 1738 ("[C]ourts invalidated legislative acts to protect vested rights because the acts were quasi-judicial 'sentences' rather than genuine 'laws.'"). Thus, valid legislative acts, in contrast to retroactive divestment statutes, stated the law going forward rather than "determin[ing] specific applications of law or . . . punish[ing] past acts"—functions relegated to the judiciary.[14] *Id.* at 1719. Because divestment statutes operated to confiscate or vitiate previously vested rights, the nineteenth-century public viewed these laws as "judicial decrees in disguise." Nathan N.

---

P.3d 1235 (explaining that "[i]t is not our place" to "substitut[e] our own value judgment for that of the people of Utah when they drafted and ratified the constitution").

[13] The vested-rights principle of due process should not be confused with the modern notion of "substantive due process" developed in cases like *Lochner v. New York*, 198 U.S. 45 (1905). *See* Chapman & McConnell, *supra* note 11, at 1678–79 ("It was not until well after the ratification of the Fourteenth Amendment that . . . notions took hold in the form of what we now call substantive due process.").

[14] "All criminal and civil disputes between two private parties— all cases in which it was possible for a private citizen to 'be deprived of life, liberty, or property'—were allocated to a separate judiciary." *Id.* at 1730.

Cite as: 2020 UT 34

Opinion of the Court

Frost et al., *Courts over Constitutions Revisited: Unwritten Constitutionalism in the States*, 2004 UTAH L. REV. 333, 382 (2004) (citation omitted). And the public viewed such legislative encroachment into the domain of the judiciary as unconstitutional both as a matter of the principle of separation of powers itself[15] and under the due process clause, which was understood as policing the division of powers between coordinate branches of government.[16]

### B. Early Utah Case Law and State Convention Records

¶35 The historical view set forth above is confirmed by the principles endorsed in two of this court's early cases— *In re Handley*'s *Estate* and *Ireland*. *See supra* ¶¶ 12–14. These cases show that founding-era Utahns understood, according to the constitutional orthodoxy of the era, that the Utah Legislature lacked the power to retroactively divest vested rights. In *In re Handley*'s *Estate*, for example, we held that the legislature lacked the power to "attempt[]

---

[15] Nathan N. Frost et al., *Courts over Constitutions Revisited: Unwritten Constitutionalism in the States*, 2004 UTAH L. REV. 333, 382 (2004); *see also supra* ¶¶ 12–13 (describing our 1897 decision in *In re Handley's Estate*, 49 P. 829, 831 (Utah 1897), where we held that the legislature lacked the power to "attempt[] by a retrospective act to furnish a method by which vested rights could be divested" because allowing it to do so "would, in effect, say that the legislature may exercise judicial powers").

[16] *See generally* Chapman & McConnell, *supra* note 11. This principle seems to jibe with the historical analysis of the "open courts" right advanced by one member of this court in a concurring opinion. *See Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 77, 416 P.3d 635 (Lee, A.C.J., concurring) ("The open courts cases in place at the time of our constitution's framing recognized a limit on the legislative abrogation of 'vested rights'—rights in claims that had accrued prior to the enactment of the legislation in question. But there was a general consensus in the cases that no one had a general vested right *in the law*; only vested *causes of action* were protected. With this in mind, courts routinely held that the legislature had plenary authority to prospectively amend or abrogate existing causes of action or available remedies." (footnote omitted)). *But see id.* ¶¶ 31–34 (majority opinion) (challenging the propriety of the concurrence's historical inquiry given the posture of the case and deciding the case under the open courts standard in *Judd v. Drezga*, 2004 UT 91, 103 P.3d 135).

MITCHELL *v.* ROBERTS

Opinion of the Court

by a retrospective act to furnish a method by which vested rights could be divested" because allowing the legislature to do so "would, in effect, say that the legislature may exercise judicial powers . . . [t]he people of the state ha[d] not intrusted . . . to [it]." 49 P. 829, 831 (Utah 1897). And in *Ireland v. Mackintosh*, we explained that "he who has become released from a demand by the operation of the statute of limitations" could not have that demand restored because "the demand is gone, and to restore it would be to create a new contract for the parties[—]a thing quite beyond the power of legislation." 61 P. 901, 903 (Utah 1900) (quoting THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 454 (6th ed. 1890)).

¶36 The limitation on legislative power detailed in our early case law is also reinforced by the records of our state constitutional convention. Delegates did not explicitly consider the constitutionality of the legislative revival of a time-barred claim. But they repeatedly referred to the concept of "vested rights" in the context of the legislative power to enact retroactive laws. And their statements provide evidence of the original understanding of due process, helping us in our attempt to "ascertain and give power to the meaning of the text as it was understood by the people who validly enacted it as constitutional law."[17] They also further the goal of "immers[ing ourselves] in the shared linguistic, political, and legal presuppositions and understandings of the ratification era."[18]

¶37 We have long looked to founding-era materials like the records of the constitutional convention in ascertaining the meaning of the Utah Constitution. *See Richardson v. Treasure Hill Mining Co.*, 65 P. 74, 81 (Utah 1901) (interpreting article XII, section 18 by examining "[the framers'] discussions upon this subject[] [i]n the official report of the proceedings of the constitutional convention"). And we follow that practice here.

¶38 The delegates' discussion at the ratification debates suggests that they understood retroactive interference with vested rights as a matter beyond the power of the legislature. These statements can be separated into two categories. In the first category, the delegates voiced opinions to the effect that even the constitution they were drafting could not operate to retroactively divest a vested right. The

---

[17] *Richards v. Cox*, 2019 UT 57, ¶ 13, 450 P.3d 1074.

[18] *Neese*, 2017 UT 89, ¶ 98.

second category is comprised of statements suggesting that delegates viewed the due process clause they were drafting in accordance with the general nineteenth-century understanding of due process as described above, *supra* Part II.A. And that understanding of the state's due process clause prohibited retroactive legislative interference with vested rights.

¶39 Several delegates seem to have viewed vested rights as beyond the reach of the Utah Constitution itself—presumably by limitations imposed through the Due Process Clause of the United States Constitution. These statements indicate the view that vested rights were beyond interference. Delegate Franklin Richards, perhaps referencing external federal restraints on state power such as federal due process, said that "it has been said that the adoption of any article or provision in this Constitution cannot interfere with vested rights; that is true." *Constitutional Convention*, Day 54 (Apr. 26, 1895). And when discussing a proposed constitutional provision regarding water law, Delegate Maloney voiced the opinion that "[y]ou cannot take away vested rights by constitutional amendment or enactment, or by any act of the Legislature. That has been determined over and over again." *Id.* Day 47 (Apr. 19, 1895).

¶40 The delegates also expressed views suggesting that the Utah Due Process Clause conferred protections consistent with the general nineteenth-century understanding of due process. On the thirty-first day of the convention, Delegate Charles Varian parroted the general due process understanding of the era when he quoted "Mr. Justice Sharswood . . . speaking for the supreme court of Pennsylvania" who had said that

> [i]f . . . an act of assembly, whether general or special, public or private, operates retrospectively to take what is by existing law the property of one man and without his consent transfer it to another, with or without compensation, it is in violation of that clause in the bill of rights which declares that no man can be deprived of his life, liberty, or property, unless by the judgment of his peers, or the law of the land. By "the law of the land" is meant, not the arbitrary edict of any body of men, not an act of assembly, though it may have all the outward forms of a law, but due process of law by which either what one alleges to be his property is adjudged not to be his, or it is forfeited upon his conviction by his peers of some crime for which by law it was subject to forfeiture, when the crime was committed. If this be not so, every restriction upon

> legislative authority would be a vain formula of words
> without life or force."

*Id.* Day 31 (Apr. 3, 1895). Varian also suggested, seemingly in reference to the state Due Process Clause, that provisions of the constitution outside of the takings provision being debated at the time would prevent interference with vested rights: "I have it, it is mine, it belongs to me, it is vested in me, it is protected, not only in the Constitution *in other sections*, but by the general law underlying all constitutions." *Id.* Day 22 (Mar. 25, 1895) (emphasis added).

¶41 These statements, together with our early case law, confirm the view that early Utahns viewed the guarantee of due process as a limitation on legislative power. They understood that the due process guarantee foreclosed legislative acts vitiating a person's vested rights.

¶42 The key question that arose at the convention was not whether the legislature lacked the power to divest vested rights but which rights qualified as vested. As Delegate Richards indicated, "it has been said that the adoption of any article or provision in this Constitution cannot interfere with vested rights; that is true. But what are vested rights? That is the question." *Id.* Day 54 (Apr. 26, 1895). We turn to that question next.

### C. A Ripened Limitations Defense as a Vested Right

¶43 A vested right is "a term of art with a specific, historical meaning."[19] And by the time of the framing of the Utah Constitution, vested rights were a well-established class of property. Just a year prior to the drafting of the Utah Constitution in 1895, this court's territorial antecedent defined a vested right as "title, legal and equitable, to the present and future enjoyment of property, or to the present enjoyment of a demand or a legal exemption from a demand." *Toronto v. Salt Lake Cty.*, 37 P. 587, 588 (Utah 1894). And "Thomas Cooley, the preeminent authority of the late nineteenth century on state constitutional matters,"[20] defined vested rights in similar terms in the 1870s: "a vested right . . . is something more than such a mere expectation as may be based upon an anticipated

---

[19] *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 81, 416 P.3d 635 (Lee, A.C.J., concurring).

[20] *Am. Bush v. City of South Salt Lake*, 2006 UT 40, ¶ 13, 140 P.3d 1235.

Opinion of the Court

continuance of the present general laws: it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another." THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 415 (3rd ed. 1874).

¶44 A ripened limitations defense seems to fit within this definition, since it is at least arguably "a legal exemption from a demand." *Id.* And that conclusion is confirmed by founding-era evidence on this precise question. The *Ireland* case, discussed in detail above, *supra* ¶ 14, speaks to this question. *Ireland* was decided just a few years after Utah attained statehood. And the *Ireland* opinion's lengthy due process[21] analysis provides compelling evidence that early Utahns viewed revival of a time-barred claim as an impermissible interference with a vested right.

¶45 The *Ireland* court began its constitutional analysis by noting that the appellant had argued that her claim should be revived under *Campbell v. Holt*, 115 U.S. 620 (1885)—a United States Supreme Court opinion dealing with due process rights in the context of a limitations defense. *Ireland v. Mackintosh*, 61 P. 901, 902 (Utah 1900). In *Campbell* the Court had referenced the general understanding of vested rights in the context of due process when it said that "it may . . . very well be held that in an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative act passed after the bar has become perfect, that such act deprives the party of his property *without due process of law*." 115 U.S. at 623 (emphasis added). But as the *Ireland* court noted, *Campbell* then concluded (over a vigorous dissent) that due process rights were not implicated because "no one has property in the bar of the statute as a defense to a promise to pay a debt, and that such a bar may be removed by the repeal of the statute."[22] *Ireland*, 61 P. at 902.

---

[21] While the opinion made explicit reference to "due process" only once, it began its discussion with the due process reference; and the balance of the discussion stemmed from this starting principle. *See generally Ireland v. Mackintosh*, 61 P. 901 (Utah 1900).

[22] In *Campbell v. Holt*, the Court held that "[w]e certainly do not understand that a right to defeat a just debt by the statute of limitations is a vested right, so as to be beyond legislative power in a

(continued . . .)

MITCHELL *v*. ROBERTS

Opinion of the Court

¶46 This court disagreed with the latter conclusion, reasoning that the *Campbell* dissent had it right. A ripened limitations defense *was a vested right* that could not be retroactively divested by the legislature—"the respondent acquired a vested right . . . to plead th[e limitations] statute as a defense and bar to the action." *Id.* at 904. In support of its decision, the *Ireland* court explained that such holding would be unwise because it would allow the revival of stale claims even decades after repose had been granted: "Unless, therefore, the right to interpose the defense of the statute in the place where the bar has occurred be held to be a vested, permanent right, a stale claim which has remained barred for more than 20 years, if after that time the statute shall have been removed, may be enforced." *Id.*

¶47 This court was not alone in rejecting the *Campbell* majority's conclusion that a limitations defense was not a vested right that triggered due process protections. Contemporary academics and a large number of other states also viewed *Campbell* as a constitutional aberration. One 1909 treatise recognized that *Campbell* "stands almost alone" in its view.[23] 3 SELECT ESSAYS IN ANGLO-AMERICAN LEGAL HISTORY 569 n.1 (1909). And the *Ireland* court noted that other states had rejected the *Campbell* approach: "While the majority opinion in th[e *Campbell*] case is supported by a few of the state courts, *a much greater number sustain the minority opinion*." *Ireland*, 61 P. at 902 (emphasis added). The *Ireland* court also referenced numerous other authorities aligned with the *Campbell* dissent's view that legislative interference with a vested limitations defense was outside the bounds of legislative action. The *Ireland* court quoted Thomas Cooley, for example, who had written that "[i]t is certain that he who has satisfied a demand cannot have it revived against him, and he who has become released from a demand by the operation of the statute of limitations is equally protected. In both cases the demand is gone, and to restore it would be to create a new contract for the parties[—]*a thing quite beyond the power of legislation*." *Id.* at 903 (emphasis added) (citation omitted).

---

proper case." 115 U.S. 620, 628 (1885). This holding was an outlier in the era.

[23] It bears mentioning that *Campbell* did not reject the vested-rights due process framework. It merely held that a limitations defense did not fall under the umbrella of vested rights. And it was the latter holding that cut against the grain of constitutional thought in the late nineteenth and early twentieth centuries.

Cite as: 2020 UT 34

Opinion of the Court

¶48 For these reasons we are convinced that the *Ireland* decision reflects the constitutional zeitgeist that binds us. *Campbell* is an aberration. And it is therefore clear that a ripened limitations defense was historically viewed as a vested right beyond the reach of legislative authority.

¶49 We need not comprehensively catalog the list of vested rights that are protected from retroactive legislative interference to resolve the questions presented. It suffices to conclude that a ripened limitations defense is one of those rights. We so hold. And we therefore conclude that Utah Code section 78B-2-308(7) is an unconstitutional exercise of legislative power.

### III. CONCLUSION

¶50 We can appreciate the moral impulse and substantial policy justifications for the legislature's decision to revive previously time-barred claims of victims of child sex abuse. Child sex abuse is a "massive national problem" whose devastating "effects . . . often span a lifetime."[24] For a variety of reasons,[25] moreover, "the majority of child sexual abuse survivors [do] not disclose their abuse until adulthood."[26] The legislature clearly had these concerns in mind in enacting Utah Code section 78B-2-308(7). And that judgment is an eminently reasonable one at a policy level.

¶51 The question presented for us, however, is not a matter of policy. We are asked to give voice to the limitations on our government established in the charter—the constitution—ratified by the voice of the people. The terms of that charter merit our respect unless and until they are amended or repealed. And we must

---

[24] Symone Shinton, Note, *Pedophiles Don't Retire: Why the Statute of Limitations on Sex Crimes Against Children Must Be Abolished*, 92 CHI.-KENT L. REV. 317, 318, 320 (2017).

[25] *See* UTAH CODE § 78B-2-308(1) (finding that delayed reporting occurs because "it takes decades for children and adults to pull their lives back together and find the strength to face what happened to them" and that "the perpetrator is [often] a member of the victim's family" or, at the very least, "rarely a stranger").

[26] Shinton, *supra* note 24, at 320.

MITCHELL *v.* ROBERTS

Opinion of the Court

enforce the original understanding of those terms whether or not we endorse its dictates as a policy matter.[27]

¶52 We render our decision with this in mind. The problems presented in a case like this one our heart-wrenching. We have enormous sympathy for victims of child sex abuse. But our oath is to support, obey, and defend the constitution. And we find the constitution to dictate a clear answer to the question presented. The legislature lacks the power to retroactively vitiate a ripened statute of limitations defense under the Utah Constitution.

————————

---

[27] JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 303 (2nd ed. 1851) ("[T]he policy of one age may ill suit the wishes or the policy of another. The constitution is not to be subject to such fluctuations. It is to have a fixed, uniform, permanent, construction. It should be . . . the same yesterday, to-day, and for ever."); *see also A.M. v. Holmes*, 830 F.3d 1123, 1170 (10th Cir. 2016) (Gorsuch, J., dissenting) (noting that "a judge who likes every result he reaches is very likely a bad judge, reaching for results he prefers rather than those the law compels"); Douglas H. Ginsburg, *Originalism and Economic Analysis: Two Case Studies of Consistency and Coherence in Supreme Court Decision Making*, 33 HARV. J.L. & PUB. POL'Y 217, 237 (2010) ("By restricting the acceptable bases of a decision, originalism limits the range of plausible outcomes. Indeed, originalism has become more constraining as originalist methodology has become more objective over time.").